[993 NYS2d 428]

Henry Phipps Plaza South Associates Ltd., Partnership, Respondent, v Judith Quijano, Appellant, et al., Respondents.

Supreme Court, Appellate Term, First Department, August 5, 2014

## APPEARANCES OF COUNSEL

*William E. Leavitt*, New York City, for appellant.

*Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, New Hyde Park (*Arianna Gonzalez-Abreu* of counsel), for Henry Phipps Plaza South Associates Ltd., Partnership, respondent.

## OPINION OF THE COURT

Per Curiam.

Final judgment, entered August 6, 2012, affirmed, with $25 costs.

The trial court's fact-laden determination that tenants intentionally misrepresented their household income on annual Section 8 recertifications finds ample support in the record and, indeed, is not now challenged by tenant appellant on sufficiency or weight of the evidence grounds. Nor is the penalty of termination of the tenancy disproportionate to tenants' misconduct, particularly in this case, where tenant appellant's present argument that the misrepresentation was short-lived and the underreporting of income de minimis, was not raised at trial and, in fact, was contrary to tenants' (ultimately discredited) trial testimony that no violation occurred. Moreover, tenant-appellant's current claim that the unlawful occupant vacated the premises in April 2011 is belied by the credited trial testimony of the Department of Housing and Urban Development inspector. "A vital public interest underlies the need to enforce income rules pertaining to public housing . . . The deterrent value of eviction . . . is clearly significant and supports the purposes of the limited supply of publicly-supported housing" (*see Matter of Perez v Rhea*, 20 NY3d 399, 405 [2013]).

Tenant appellant's remaining arguments are unpreserved for appellate review, and, in any event, are unavailing.

SCHOENFELD, J. (dissenting). I agree with the majority that the deterrent value of eviction, where a tenant intentionally misrepresents her household income on a Section 8 recertification, supports the purpose of the limited supply of public-supported housing. Nevertheless, we cannot simply reach the "right" result heedless of crucial safeguards. Our society can sooner tolerate an arguably "undeserving" tenant than to ignore due process. Here, landlord failed to follow the proper Department of Housing and Urban Development (HUD) procedures before attempting to terminate the long-term (40-

plus year) tenancy of the then pro se appellant, Ms. Quijano. Landlord did not provide Ms. Quijano with notice of the possibility of eviction based on fraud, nor did it afford this unrepresented tenant with the opportunity to respond prior to commencement of eviction proceedings as was required by HUD rules. This "eviscerated the procedural safeguards intended to prevent improper termination." (*See Kingsbridge Ct. Assoc., L.P. v Hamlette*, 25 Misc 3d 1238[A], 2009 NY Slip Op 52486[U], *4 [Civ Ct, Bronx County 2009].) The HUD requires that owners of buildings with tenants who receive federal subsidies, including Section 8 tenants, must follow mandatory written procedures before they may seek evictions. (*See* HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs [hereinafter HUD Handbook]). These procedures preserve low income tenants' due process rights by ensuring that they "have received proper notice and an opportunity to respond" before being evicted (HUD Handbook § 8-1 [A]). According to the HUD Handbook, when fraud is suspected, before initiating eviction proceedings the owner must:

1. Conduct a pre-termination investigation—The owner must do an independent investigation and document the proof of the allegations prior to initiating any termination proceedings based on fraud (HUD Handbook § 8-18 [C] [1]). This investigation should include determining whether the fraud was intentional—whether "the tenant knowingly provided inaccurate or incomplete information" (HUD Handbook § 8-18 [E] [3]).

2. Notify the tenant in writing and give him/her an opportunity to be heard—If the owner is able to document the fraud, it then must notify the tenant in writing concerning the suspected fraud and what information it believes has been incorrectly provided. In the letter, the owner must advise the tenant of the opportunity to meet with a representative of the landlord who was not involved in the investigation within 10 days and of the possibility of the termination of tenancy (HUD Handbook § 8-18 [D]).

3. Issue a final decision—Within 10 days of the meeting, the owner must give the tenant written notice of its final decision, which must be based solely on the facts presented and discussed at the meeting with the tenant (HUD Handbook § 8-18 [D] [2] [c]).

Only after the owner follows these steps and determines that the tenant has committed intentional fraud with regard to his or her Section 8 tenancy is the "authorized course of action" to

seek termination of the tenancy (HUD Handbook § 8-19 [D] [1]; *see Green Park Assoc. v Inman*, 121 Misc 2d 204, 205 [Civ Ct, Kings County 1983] [finding HUD Handbook procedures were intended to be mandatory not advisory]; *Impac Assoc. Redevelopment Co. v Robinson*, 9 Misc 3d 1065, 1067 [Civ Ct, NY County 2005] [holding that owner of subsidized housing "must follow the pretermination procedures" set out in the HUD Handbook before terminating a tenancy based on fraud]).

The record is clear in this case that landlord did not follow these procedures. At trial a representative of the landlord's managing agent, Ms. Rubinton, testified extensively as to the steps landlord took prior to filing the petition. As part of its testimony, landlord introduced into evidence a letter from the HUD's Office of Inspector General (OIG), dated June 23, 2011, stating that it had information indicating that Ms. Quijano* "failed to report an unauthorized occupant during her annual certification" (R208). The letter, however, further states that OIG, being "an investigative agency in nature" makes no recommendations, but requests that landlord review the information and "consider what, if any, action you deem appropriate" (R208).

Pursuant to the requirements of the HUD Handbook, at this point if landlord suspected fraud and planned to terminate the tenancy on this basis, it was required to begin an independent investigation of the fraud allegations to determine if Ms. Quijano's actions were "intentional" as set forth above. However, the record is devoid of any evidence that landlord launched such an investigation. Instead, Ms. Rubinton testified only that her "staff began to look into the allegations" and that they terminated the subsidy (R85-86). As part of her testimony, landlord's attorney offered into evidence a July 18, 2011 letter from landlord to Ms. Quijano, stating that HUD "is requesting a termination of the *subsidy*" and that she will be charged "*market rent*" beginning August 1, 2011 (R264 [emphasis added]). It asks Ms. Quijano to contact the management office to set up an appointment to discuss the matter further. Notably, there was no mention of suspected fraud or of the possibility that the tenancy itself would be terminated (R121). Nor did the letter advise Ms. Quijano of the opportunity to meet with a representative of the landlord who was not involved in the investigation within 10 days as required by HUD. Instead, the record,

---

* Although Ms. Quijano's son, Mr. Bone, appears to be on the apartment lease and is a party to this case, the letter makes no mention of him.

which includes a rent ledger introduced into evidence by landlord's attorney, shows that landlord began charging Ms. Quijano the higher rent and continued to do so for nearly eight months before initiating eviction proceedings (R90-97, 265-269).

Ms. Rubinton, despite being asked at trial what actions were taken after termination of the subsidy and prior to eviction proceedings being commenced, provided no information as to any independent investigation conducted by landlord pertaining to suspected fraud as HUD required. On the contrary, she merely testified that she "reviewed the file" and instructed counsel to serve a notice of termination prior to commencing eviction proceedings (R96-97).

While landlord's letter to Ms. Quijano may have satisfied HUD regulations for termination of the Section 8 subsidy assistance based on the finding that Ms. Quijano had an unauthorized occupant in her apartment (*see* HUD Handbook § 8-6), that is not the relevant issue here. What is important here is that landlord's correspondence with Ms. Quijano fell far short of what was required to terminate her long-standing tenancy for material noncompliance of the lease based on fraud, the theory relied upon by the trial court in rendering its decision. There is no evidence that after termination of the subsidy, Ms. Quijano was given notice that landlord was investigating suspected fraud, or that it planned to evict her on that basis. Nor was she given the opportunity to meet with landlord's representatives to discuss such allegations or to present her objections prior to receiving the eviction notice.

The record thus shows that landlord, based upon its own agent's testimony and submitted exhibits, failed to distinguish the less stringent HUD requirements for terminating Section 8 benefits from the more significant prerequisites for terminating the tenancy. Further, the record reflects landlord's inability to prove compliance with the latter pretermination procedures, an issue which should and can be determined on this appeal.

Where, as here, Ms. Quijano "does not allege new facts but, rather, raises a legal argument" which appears on the face of the record, "the matter is reviewable" (*Chateau D' If Corp. v City of New York*, 219 AD2d 205, 209 [1st Dept 1996]; *Matter of Allstate Ins. Co. v Perez*, 157 AD2d 521, 523 [1st Dept 1990]; *De Rosa v Chase Manhattan Mtge. Corp.*, 10 AD3d 317, 319 [1st Dept 2004] [an appellate court "has authority to reach the merits of an argument first made on appeal . . . when the argument is clearly supported by facts already in the record"]). So

long as an "issue is determinative," and there is a sufficient record, an appellate court can "consider a new legal argument raised for the first time" on appeal (*see Facie Libre Assoc. I, LLC v SecondMarket Holdings, Inc.*, 103 AD3d 565, 565 [1st Dept 2013]; *Vanship Holdings Ltd. v Energy Infrastructure Acquisition Corp.*, 65 AD3d 405, 408 [1st Dept 2009]).

In any event, where a tenant's fundamental due process rights are involved, the issue can always "in the interests of justice" be reviewed by this court (*see Santos v National Retail Transp., Inc.*, 87 AD3d 418, 418 [1st Dept 2011] [reviewing "in the interests of justice" an argument that defendant failed to preserve, where the lower court's error was "fundamental"]; *Matter of Wong v Coughlin*, 138 AD2d 899, 900 [3d Dept 1988] [entertaining "in the interest of justice" a due process claim, despite the appeal not being timely]; *see also People v Finch*, 23 NY3d 408, 416 [2014] [the preservation standard "should be so designed as to keep unjust results to a minimum"]).

Under the circumstances, I would reverse and dismiss the holdover petition.

LOWE, III, P.J., and HUNTER, JR., J., concur; SCHOENFELD, J. dissents in a separate opinion.